IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 07-cv-00025-MSK-KLM

MICHAEL THOMPSON, #31082-007,

    Plaintiff,

v.

MR. WINN (Former Acting Warden),
MR. R. WILEY (Former Warden),
MR. H.A. RIOS, JR. (Current Warden),
MR. ORTEGA (Former Captain),
MR. MASOPUST (Former SHU Lieutenant),
MR. MOLINA (Former SHU Lieutenant),
MR. SHARTLE (Former Associate Warden), and
MR. CHAVEZ (Former SHU Lieutenant),

    Defendants.

## ORDER GRANTING, IN PART, MOTION TO DISMISS

THIS MATTER comes before the Court on the Defendants' Motion to Dismiss **(#49)**, to which the Plaintiff responded **(#51)**.[1] Having considered the same, the Court

**FINDS** and **CONCLUDES** that:

### I. Jurisdiction

The Plaintiff asserts a single claim pursuant to *Bivens v. Six Unknown Named Agents of*

---

[1] There is also a Recommendation **(#35)** by the Magistrate Judge that the Court dismiss the Plaintiff's claims due to his failure to make partial payments of the filing fee or to show cause why he was unable to do so. The Plaintiff objected **(#45)** to the Recommendation, and in apparent response to it, he has since made additional payments of $168 towards the filing fee, in substantial compliance with this Court's orders. Thus, the Court declines to adopt the Recommendation and addresses the Defendants' Motion to Dismiss on the merits. However, the Court cautions the Plaintiff that future noncompliance with this Court's orders could result in the dismissal of his claims.

*Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Therefore, the Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## II. Procedural Background

In his Complaint, the Plaintiff asserts a single claim for monetary relief against the Defendants, in their individual capacities,[2] alleging the denial of procedural due process. He seeks to recover compensatory and punitive damages, but requests no equitable relief. Because the Plaintiff is *pro se*, the Court construes his complaint and other filings liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). However, the Court cannot serve as his advocate. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

The Plaintiff alleges that starting May 13, 2004, the Defendants, all of whom worked at the United States Penitentiary ("USP") in Florence, Colorado, deprived him of his right to due process by failing to follow procedures set forth in two regulations[3] in deciding to confine him to administrative detention for a period of approximately 500 days.

The Plaintiff claims that he was first assigned to administrative detention for his own protection due to his status as a government witness in a murder case, not because of poor conduct. He alleges that the need for his protection was never verified, but he did not contest it, at first, because he thought his assignment to administrative detention would be short term.

---

[2] In his Complaint, the Plaintiff expressly alleges that "[t]his was done in their individual capacities." He also iterates that this is an individual capacity suit in his response to the motion to dismiss. However, the Court notes that if the Plaintiff had also sued the Defendants in their official capacities, the Court would be compelled to dismiss such claims. As the Tenth Circuit explained in *Hatten v. White,* 275 F.3d 1208, 1210 (10th Cir. 2002), "A *Bivens* action may not be brought against federal agencies or agents acting in their official capacities." (citing *Federal Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 483-86 (1994)).

[3] 28 C.F.R. §§ 541.22 and 541.23.

The Plaintiff alleges that approximately 40 days after he was first assigned to administrative detention, he spent 75 days in a facility in Washington D.C. because of a writ, but was then returned to the Special Housing Unit in September 2004, again to ensure his safety. He alleges that upon his return, he made several requests to be assigned to a general population unit, but his requests were denied. The reason allegedly given for such denial was that it was unsafe for the Plaintiff to be in a general population unit while housed at USP-Florence.

The Plaintiff alleges that on December 1, 2004, he asked to be transferred to another institution where he could be assigned to a general population unit, or to be assigned to the D-B Transition Unit at USP-Florence, which at that time was less restrictive than the Special Housing Unit. He alleges that he was moved to the D-B Transition Unit on January 14, 2005, but by that time the D-B Unit had been converted into an overflow unit for the Special Housing Unit and provided substantially the same privileges and restrictions as the Special Housing Unit. He alleges that he made repeated requests to be transferred out of the D-B Unit into a general population unit, but was again told that he would remain in administrative detention until he could be transferred to another institution.

The Plaintiff alleges that he was moved back into the Special Housing Unit on May 9, 2005, after he received an incident report for calling a staff member a Nazi. He alleges that he should have been moved out of the Special Housing Unit after 10 days, because that was the sanction imposed for the infraction, but he remained confined there. He alleges that after May 9, 2005, he complained of his continued confinement in administrative detention to Defendants Molina and Ortega, who refused to move the Plaintiff to another housing assignment. He alleges that after July 2005, he also made such complaints and requests to Defendants Molina, Rios, and

Chavez, with the same results.

The Plaintiff alleges that he remained in the Special Housing Unit at USP-Florence until January 2006, when he was transferred to USP-Beaumont.[4]

The Plaintiff alleges that assignment to administrative detention at USP-Florence imposed atypical and significant hardships in relation to the ordinary incidents of prison life. In specific, he alleges that while he was in administrative detention, he was confined to his cell 23 hours per day, was denied access to the commissary 23 hours per day, was placed in handcuffs any time he left his cell, was given restricted access to the telephone, showers, recreation, the law library, and educational and rehabilitative programs, was allowed only non-contact visits with family, and was provided "limited access" to medical and dental care.[5] He alleges that these conditions are more onerous than those provided to general population inmates, but does not expressly allege how they are different.

The Plaintiff alleges that continued confinement in administrative detention required periodic review, but that the required procedures were not followed. He alleges that he was not allowed to attend or participate in his "30 day SRO reviews" and was not advised or provided a copy of any findings made during these reviews. He also claims that he was denied a hearing meeting the requirements of 28 C.F.R. § 541.17, within 7 days after he was assigned to administrative detention for his own protection, or within 7 days after he objected to his continued

---

[4] The Plaintiff alleges that he was assigned to a Special Housing Unit at USP-Beaumont, but he does not assert any claims arising out of such assignment in the instant lawsuit.

[5] He offers no explanation as to what "limited access" means, *i.e.,* whether he was restricted to scheduling appointments at particular times of day, or whether he was not able to obtain necessary medical or dental care when he needed it.

4

assignment to administrative detention. He also claims that his assignment to administrative detention should not have exceeded 90 days without clearly documented reasons for an extension. He further claims that he should have been transferred to another prison where his safety was not threatened and he could have been integrated into the general population.

### III. Issue Presented

The Defendants move to dismiss the Plaintiff's claim pursuant to Fed. R. Civ. P. 12(b)(6). They contend that the Plaintiff has failed to state a claim for violation of his right to due process, that they are entitled to qualified immunity, that the Plaintiff has failed to allege that Defendants Shartle or Masopust personally participated in the alleged constitutional violation, and that the Plaintiff is barred from recovering compensatory damages because he failed to allege a physical injury. The Plaintiff responds that there are clearly established regulations which governed the Defendants' conduct, but the Defendants did not follow those regulations.

The issue presented is whether the Plaintiff's due process claim must be dismissed for any of the reasons articulated by the Defendants.

### IV. Standard of Review

Under Fed. R. Civ. P. 12(b)(6), a party may move to dismiss a claim for relief on the basis that it fails to state any claims upon which relief may be granted. There is a strong presumption against the dismissal of claims under this rule. *See Cottrell, Ltd. v. Biotrol Intern., Inc.,* 191 F.3d 1248, 1251 (10th Cir. 1999). The Court accepts all well-pleaded allegations in a complaint as true and construes them in the light most favorable to the plaintiff. *See Williams v. Meese,* 926 F.2d 994, 997 (10th Cir. 1991). A plaintiff is not required to include detailed factual allegations in a complaint, but a complaint must contain "more than labels and conclusions" and must consist

of more than "a formulaic recitation of the cause of action[.]" *See Bell Atlantic Corp. v. Twombly*, _ U.S. _, 127 S. Ct. 1955, 1964-65 (2007). Rather, it must contain factual allegations which are "enough to raise a right to relief above the speculative level[.]" *Id.*

## V. Analysis

### A. Did the Plaintiff State a Claim for Denial of Due Process?

The Plaintiff claims that he was not provided with the required procedural safeguards before and after he was assigned to administrative detention. To state a claim for the denial of procedural due process, he must allege: (1) that he was deprived of a liberty or property interest; (2) without constitutionally adequate process. *See Board of Regents v. Roth*, 408 U.S. 564, 569-70 (1972). Here, the Plaintiff contends that he was deprived of a liberty interest by assignment to administrative detention, and that the Defendants failed to provide due process as prescribed by two applicable regulations. He does not, however, challenge the constitutional sufficiency of the process the regulations prescribe.

The Defendants contend that the Plaintiff has not sufficiently pled a due process violation because he has demonstrated no loss of a liberty interest. To the extent that they rely upon evidence outside the pleadings (and a statement of facts premised upon such evidence), the Court disregards such evidence, and instead limits itself to the allegations of the Complaint.

#### 1. Did the Plaintiff Plead Facts to Support a Liberty Interest?

The United States Supreme Court has long recognized that the Due Process Clause does not, of its own force, confer a liberty interest upon prisoners to be free from conditions of confinement which are within the sentence imposed. *Montanye v. Haymes,* 427 U.S. 236, 242 (1976).

Prior to 1995, the existence and scope of an inmate's liberty interest, and therefore whether there was a due process violation, was determined by the language of the applicable regulations. However, in *Sandin v. Conner*, 515 U.S. 472, 477-84 (1995), the United States Supreme Court ruled that the determination of whether an inmate had a liberty interest that gave rise to due process protection required that the inmate suffer an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life[.]" *Id.* at 484.

In *Sandin*, the inmate was sentenced to 30 days in disciplinary segregation for an infraction of a prison rule. He contended that state prison regulations afforded him a liberty interest to avoid disciplinary segregation, such that he was entitled to due process. In its analysis of whether the inmate had a protected liberty interest, the Supreme Court eschewed the old method of examining prison regulations to determine whether there was an entitlement, and prescribed a new method. It did this to avoid "two undesirable effects": (1) the creation of disincentives for States to codify their prison management procedures, for fear that they would create entitlements; and (2) the involvement of courts in the day-to-day management of prisons. *Sandin*, 515 U.S. at 482. Now, under *Sandin*, an inmate has a protected liberty interest to the extent that his or her confinement results in an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life."

Applying that new standard, the Supreme Court in *Sandin* considered whether the inmate's assignment to segregation represented a dramatic departure from the basic conditions of his indeterminate 30 years to life prison sentence. It specifically considered the conditions of confinement in disciplinary segregation and compared them with other types of segregation,

7

finding no significant difference.[6] It also compared the nature of the inmate's confinement in relation to what it would have been in the general population, finding no significant difference. Finally, it considered whether confinement in segregation would have any impact on the duration of his sentence, and found none. Based upon this analysis, it concluded that the inmate had no protected liberty interest.

Since *Sandin*, several cases have examined whether inmates had a protected liberty interest in avoiding a segregation assignment. Most recently, the Supreme Court addressed this issue in *Wilkinson v. Austin*, 545 U.S. 209 (2005). In *Wilkinson*, the Supreme Court considered whether inmates had a liberty interest to avoid placement in Ohio's Supermax facility and whether the procedures adopted by the State of Ohio for classifying and placing inmates into a "Supermax" prison provided constitutionally adequate process.

Guided by *Sandin*, the Supreme Court considered the totality of the conditions at Supermax to determine whether they imposed an atypical and significant hardship. The conditions were: (1) all human contact was prohibited, including conversations between inmates in neighboring cells; (2) the lights were on 24 hours per day, and if an inmate attempted to shield the light, he could be disciplined; (3) inmates could exercise 1 hour per day in a small indoor room, but were confined to their 7 feet by 14 feet cells for the remaining 23 hours; (4) assignment to Supermax was indefinite (except as limited by the term of imprisonment) with only annual reviews as to the propriety of placement; and (5) inmates otherwise eligible for parole were disqualified. It found that these conditions, viewed together, amounted to a sufficiently atypical and significant hardship such that there was a protected liberty interest subject to due process

---

[6] The conditions, themselves, were not mentioned in the opinion.

protection.

Within the Tenth Circuit, several cases address whether particular segregation assignments gave rise to a protected liberty interest. Although some of the decisions are unpublished, they nevertheless demonstrate what conditions have and have not been considered atypical and significant enough to create a protected liberty interest.

In *Hill v. Fleming*, 2006 WL 856201 (10th Cir. Apr. 4, 2006), an inmate claimed that the conditions and duration of his confinement in administrative detention, created a protected liberty interest which entitled him to due process. The inmate claimed that he was in administrative detention at USP-Florence for 399 days, was confined to his cell 23 hours per day, was denied sick calls, educational privileges, work privileges, visitation, use of the telephone, access to the commissary, access to libraries, and access to the general population recreation area. On a motion for summary judgment, the district court found a genuine factual dispute as to whether the inmate was deprived of a liberty interest, but concluded that the defendants were entitled to qualified immunity. The Tenth Circuit affirmed. It agreed with the district court that it was inappropriate to enter summary judgment on whether a protected liberty interest existed.

In *Jordan v. Federal Bureau of Prisons*, 2006 WL 2135513 (10th Cir. Jul. 25, 2006), an inmate alleged that his 5-year assignment to administrative detention at USP-Florence, pending a murder investigation, implicated a protected liberty interest entitling him to due process. He claimed that, at first, he was allowed sporadic indoor exercise less than once a week, and that prison staff restricted his ability to correspond with others, to possess stationery, to access library materials, and to obtain personal property. He claimed that he was later allowed to exercise 2 ½ hours per week, that he sometimes lacked access to a radio or television, but that he did have

9

access to educational and recreational programs, medical and psychological services, library services, and staff. He also was allowed one social call per month. In considering a motion for summary judgment, the district court concluded that there was no protected liberty interest, and granted summary judgment for the defendants.

The Tenth Circuit affirmed. In addressing whether the undisputed facts demonstrated a protected liberty interest, it first compared the conditions of the inmate's confinement with those in the general population. It determined that the diminished opportunity for exercise and social calls was not an atypical and significant deprivation. The Tenth Circuit then compared the inmate's conditions of confinement with those in *Wilkinson*, and determined they were less onerous because the inmate had frequent contact with staff, the length of his sentence was unaffected, and his confinement was not indefinite and was instead limited to the duration of the pending murder investigation. As for the duration of the inmate's confinement in segregation, the Tenth Circuit declined to conclude that the length of time, standing alone, created a protected liberty interest, noting that the typicality of the length of the detention depended upon the reason for the inmate's assignment to detention, which in that case was a pending criminal investigation.

Last year, in *Estate of DiMarco v. Wyoming Dept. of Corrections, Div. of Prisons,* 473 F.3d 1334 (10th Cir. 2007), the Tenth Circuit considered the case of a hermaphrodite[7], incarcerated in a women's facility operated by the State of Wyoming, who was in administrative segregation for her own protection during her entire 14-month sentence of imprisonment. In analyzing whether there was a protected liberty interest, the Tenth Circuit followed *Sandin* and *Wilkinson*, attempted to refine the liberty interest analysis. It explained that when a court

---

[7] The inmate lived as a woman but was anatomically male.

examines the conditions of an inmate's confinement in segregation, it should not limit itself to comparisons between inmate populations, but should assess several relevant factors, including whether: "(1) the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement, as it did in *Wilkinson*; and (4) the placement is indeterminate[.]" *Id.* at 1342. In this case, the Tenth Circuit employed a "totality" of factors type of analysis. In finding no protectible liberty interest, it considered that: (1) the inmate was assigned to segregation for her own protection, and for the safety of other inmates; (2) sending the inmate to a men's prison was not a viable alternative; (3) the conditions of her confinement were spartan but not atypical of protective custody; (4) she was allowed out of her cell 5 ½ hours per day; (5) she was denied interaction with other inmates; (6) she had access to the library, recreational and religious facilities; (7) she had access to a number of prison programs; (8) assignment to segregation did not lengthen her confinement; and (9) her assignment to segregation was reviewed every 90 days.

From the above caselaw, the Court discerns that determination of whether there is a protected liberty interest is highly fact dependent and requires consideration of a number of non-exclusive factors, viewed in their totality. No precedent squarely addresses the precise conditions of confinement alleged in the Complaint (and it is not clear that the conditions alleged are comprehensive). The alleged deprivations appear to fall somewhere between those in *Hill*, where there was arguably a liberty interest, and *Jordan*, where there was not. Because the Plaintiff appears *pro se*, and the Court at this juncture is evaluating the sufficiency of his pleading through the lens of *Haines v. Kerner*, *supra*, the Court is not prepared to say that the Plaintiff cannot

prove facts to demonstrate a protected liberty interest.

**2. What Process Was Due?**

Assuming sufficient allegations to support a liberty interest, the Court turns to the question of what process was due. The Plaintiff alleges that the required processes were set forth in two regulations, 28 C.F.R. §§ 541.22 and 541.23.[8]

These two regulations apply in different circumstances, but can overlap. The first, 28 C.F.R. § 541.22, applies in all circumstances of administrative detention. The second regulation, 28 C.F.R. § 541.23, applies when inmates are placed in administrative detention for their own protection. It is undisputed that 28 C.F.R. §§ 541.22 and 541.23 set forth procedures applicable to the Plaintiff's continuing assignment to administrative detention.

Here, the Plaintiff alleges that he remained in the Special Housing Unit for more than 90 days after he completed his 10-day disciplinary segregation in May 2005,[9] that he was not given

---

[8] He does not challenge the constitutional sufficiency of the processes prescribed by these regulations. The Defendants do not contend that anything less was required. Thus, for purposes of this ruling, the Court does not apply the analytical framework of *Mathews v. Eldridge*, 424 U.S. 319 (1976), to determine whether some greater or lesser process was required.

[9] *See* 28 C.F.R. § 541.22(a)(6), which provides:
(a) Placement in administrative detention. . . . The Warden may also place an inmate in administrative detention when the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution and when the inmate: . . .
    (6) Is terminating confinement in disciplinary segregation and placement in general population is not prudent. The Segregation Review Official is to advise the inmate of this determination and the reasons for such action.
        (i) Except for pretrial inmates or inmates in a control unit program, staff ordinarily within 90 days of an inmate's placement in post-disciplinary detention shall either return the inmate to the general inmate population or request regional level assistance to effect a transfer to a more suitable institution.
        (ii) The Assistant Director, Correctional Programs Division, shall review

(continued...)

written reasons for his placement in administrative detention,[10] that he was not allowed to attend SRO hearings and was not given a written copy of the SRO's decision,[11] that he was held in

---

[9](...continued)
>for purpose of making a disposition, the case of an inmate not transferred from post-disciplinary detention within the time frame specified in paragraph (a)(6)(i) of this section.
>(iii) Staff in a control unit will attempt to adhere to the 90-day limit for an inmate's placement in post-disciplinary detention. Because security needs required for an inmate in a control unit program may not be available outside of post-discipline detention, the Warden may approve an extension of this placement upon determining in writing that it is not practicable to release the inmate to the general inmate population or to effect a transfer to a more suitable institution.
>(iv) The appropriate Regional Director and the Assistant Director, Correctional Programs Division, shall review (for purpose of making a disposition) the case of an inmate in a control unit program not transferred from post-disciplinary detention within the 90-day time frame specified in paragraph (a)(6)(iii) of this section. A similar, subsequent review shall be conducted every 60-90 days if post-disciplinary detention continues for this extended period.

[10] *See* 28 C.F.R. § 541.22(b), which provides: "Administrative detention order detailing reasons for placement. The Warden shall prepare an administrative detention order detailing the reasons for placing an inmate in administrative detention, with a copy given to the inmate, provided institutional security is not compromised thereby. Staff shall deliver this order to the inmate within 24 hours of the inmate's placement in administrative detention, unless this delivery is precluded by exceptional circumstances. . . ."

[11] *See* 28 C.F.R.§541.22(c)(1), which provides:
(1) Except as otherwise provided in paragraphs (c)(2) and (c)(3) of this section, the Segregation Review Official will review the status of inmates housed in administrative detention. The SRO shall conduct a record review within three work days of the inmate's placement in administrative detention and shall hold a hearing and formally review the status of each inmate who spends seven continuous days in administrative detention, and thereafter shall review these cases on the record (in the inmate's absence) each week, and shall hold a hearing and review these cases formally at least every 30 days. The inmate appears before the SRO at the hearing unless the inmate waives the right to appear. . . . Administrative detention is to be used only for short periods of time except where an inmate needs long-term protection (see § 541.23), or where there are exceptional circumstances, ordinarily tied to security or complex investigative concerns. An inmate may be kept in administrative detention for longer term protection only if the need for such protection is documented by the SRO. Provided institutional security is not compromised, the inmate shall receive at each formal review a written copy of the SRO's decision and the basis for this finding. The SRO shall release an inmate from administrative detention when reasons for placement cease to exist. . . .

protective administrative detention beyond the time when he felt he needed to be detained,[12] that he was denied a hearing meeting the requirements of § 541.17,[13] and that staff did not make efforts to transfer him to another facility where he could be housed in the general population.[14] Thus, he has stated a claim for the denial of procedural due process.

## B. Are the Defendants Entitled to Qualified Immunity?

The Defendants assert that they are entitled to qualified immunity. The Plaintiff has not clearly addressed this specific argument, but he appears to oppose it.

Government officials are entitled to qualified immunity from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which

---

[12] *See* 28 C.F.R. 541.22(c)(3), which provides: "When an inmate is placed in administrative detention for protection, but not at that inmate's request, the Warden or designee is to review the inmate's status within two work days of this placement to determine if continued protective custody is necessary. A formal hearing is to be held within seven days of the inmate's placement (see § 541.23, Protection Cases). . . ."

*See* also 28 C.F.R. 541.23(b) & (c), which provide in relevant part:
(b) Inmates who are placed in administrative detention for protection, but not at their own request or beyond the time when they feel they need to be detained for their own protection, are entitled to a hearing, no later than seven days from the time of their admission (or from the time of their detention beyond their own consent). This hearing is conducted in accordance with the procedural requirements of § 541.17, as to advance written notice, staff representation, right to make a statement and present documentary evidence, to request witnesses, to be present throughout the hearing, and advance advisement of inmate rights at the hearing, and as to making a record of the proceedings.
(c) Ordinarily, staff may place an inmate in administrative detention as provided in paragraph (a) of this rule relating to protection cases, for a period not to exceed 90 days. Staff shall clearly document in the record the reasons for any extension beyond this 90-day period.

[13] *See ibid.*

[14] *See* 28 C.F.R. § 541.23(d), which provides: "Where appropriate, staff shall first attempt to place the inmate in the general population of their particular facility. Where inappropriate, staff shall clearly document the reason(s) and refer the case, with all relevant material, to their Regional Director, who, upon review of the material, may order the transfer of a protection case."

a reasonable person in their position would have known. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity also offers protection from trial and other burdens of litigation. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *see also Jones v. Hunt*, 410 F.3d 1221, 1225 (10th Cir. 2005). The doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *See Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1251 (10th Cir. 2003) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Determination of whether a defendants is entitled to qualified immunity in the context of a motion under Fed. R. Civ. P. 12(b)(6) involves a 2-pronged inquiry. A court first determines whether the plaintiff pled a constitutional violation in his Complaint. *See Denver Justice and Peace Committee, Inc. v. City of Golden,* 405 F.3d 923, 928 (10th Cir. 2005). As discussed *supra*, the Plaintiff has done so here.

Then a court determines whether the constitutional right was clearly established at the time of the allegedly unlawful conduct. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001)*; Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004). This latter inquiry is made in light of the specific context of the case, not as a broad general proposition. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier*). Whether the law was clearly established is essentially a legal question and is measured by an objective standard. *See Crawford-El v. Britton,* 523 U.S. 574, 589-90 (1998).

Although there need not be a factually identical case to demonstrate that the constitutional right was clearly established, there must be a Supreme Court or Tenth Circuit opinion on point, or the right must be supported by the weight of sufficiently analogous authority from other courts. *See Martinez v. Carr,* 479 F.3d 1292, 1295 (10th Cir. 2007). In other words, there must be

caselaw in which a constitutional violation was found based upon similar conduct. *See Callahan v. Millard County,* 494 F.3d 891, 903 (10th Cir. 2007), *petition for cert. granted*, 76 U.S.L.W. 3316 (Mar. 24, 2008) (No. 07-751).[15]

The Plaintiff has not identified any applicable caselaw which creates a due process right, relying instead upon the subject regulations, 28 C.F.R. §§ 541.22 or 541.23. Because the Plaintiff is *pro se*, the Court has canvassed the applicable caselaw to determine what rights were clearly established, and when. This canvass circles back to the prior analysis of a liberty interest. Consistent with that analysis, at the time of the filing of the Complaint in this case, there was arguably a liberty interest subject to due process protection. The question is when did it become clearly recognized.

The regulations, standing alone, would not have placed the Defendants on such notice, because *Sandin* instructed that courts are no longer to consider the regulations, by themselves, to determine whether there is a liberty interest. However, the Supreme Court's decision in *Wilkinson*, issued on June 13, 2005, put prison officials on notice that the assignment of an inmate to segregation under conditions which impose atypical and significant hardships in relation to the ordinary incidents of prison life may give rise to a protected liberty interest. Prior to *Wilkinson*, there was no such clear pronouncement of the law on this issue. Once *Wilkinson* was issued, the law recognizing that administrative detention might create a liberty interest subject to due process protection was clearly established.

The Plaintiff in this case complains of assignment to administrative detention both prior

---

[15] In *Callahan*, among the issues the parties will address on appeal is whether the decision in *Saucier v. Katz,* 533 U. S. 194 (2001) should be overruled. The other issues presented on appeal are not pertinent to the instant case.

and subsequent to issuance of the *Wilkinson* opinion. As to Plaintiff's detention prior to the issuance of *Wilkinson*, June 13, 2005, the Defendants are entitled to qualified immunity because no liberty interest in being free from administrative detention based upon conditions of confinement similar to those at issue in this case was clearly recognized. As to his detention after the issuance of *Wilkinson*, and based upon the pleadings, the Court finds that qualified immunity is not applicable. After June 13, 2005, the Plaintiff also complains that only four of the Defendants – Molina, Ortega, Rios, and Chavez – denied him due process. Therefore, the Plaintiff may proceed on his due process claim against only these Defendants.

**C. Is the Plaintiff Barred from Recovering Monetary Relief?**

The Defendants contend that the Plaintiff is barred from recovering monetary relief because he has not pled facts to support any physical injury. The Plaintiff did not respond to this contention.

Under 42 U.S.C. § 1997e(e), a prisoner cannot recover compensatory relief "for mental or emotional injury suffered while in custody without a prior showing of physical injury." However, absent a physical injury, a prisoner can recover punitive and nominal damages. *See Searles v. Van Bebber*, 251 F.3d 869, 876 (10th Cir. 2001). The Plaintiff has neither alleged a physical injury in his Complaint nor in his response to the Defendants' motion. Thus it appears that there is none to be plead.

As a consequence, the Plaintiff cannot recover compensatory relief, but could recover punitive damages. Therefore, he may proceed with his claim.

**IT IS THEREFORE ORDERED** that:

(1) The Court declines to adopt the Recommendation **(#35)** by the Magistrate Judge

to dismiss the Plaintiff's claim.

(2) The Defendants' Motion to Dismiss **(#49)** is **GRANTED IN PART and DENIED IN PART.** All claims against Defendants Winn, Wiley, Masopust and Shartle are **DISMISSED**, and their names shall be deleted from the caption.

(3) The Plaintiff may proceed with his claim against Defendants Molina, Ortega, Rios, and Chavez for the denial of due process, but any recovery is limited to nominal and punitive damages. Such claim is also limited to actions by these Defendants after June 13, 2005.

Dated this 31st day of March, 2008

                                              **BY THE COURT:**

*/s/ Marcia S. Krieger*

                                              Marcia S. Krieger
                                              United States District Judge